

FILED

NOV 0 5 2019

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALBERTO GUILLEN,<br><br>Petitioner,<br><br>vs.<br><br>PATRICK MCTIGHE, TIM FOX,<br><br>Respondents. | Cause No. CV 19-22-M-DLC-KLD<br><br><br>ORDER AND FINDINGS AND<br>RECOMMENDATION OF UNTED<br>STATES MAGISTRATE JUDGE |

This case comes before the Court on state pro se petitioner Alberto Guillen's application for writ of habeas corpus under 28 U.S.C. § 2254.  For the reasons set forth below, Guillen's petition should be denied.

## I.     28 U.S.C. § 2254 Petition

The Court is required to screen all actions brought by prisoners who seek relief.  28 U.S.C. § 1915(a).  The Court must dismiss a habeas petition or portion thereof if the prisoner raises claims that are legally frivolous or fails to state a basis upon which relief may be granted.  28 U.S.C. § 1915A(b)(1), (2).  The Court must dismiss a habeas petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief."  Rule 4 Governing Section 2254 Cases.  Because Guillen's claims do not survive deferential review, his petition should be denied.

1

## II.    Procedural History

On July 30, 2011, following a verbal argument and physical altercation with his twin brother, Roberto, Guillen got in his van and struck and ran over Roberto, who was on a bicycle, at an intersection in Missoula, Montana.[1]  Guillen fled the scene; Roberto sustained life-threatening injuries and was hospitalized for a month following the collision.  On August 15, 2011, Guillen was charged in Montana's Fourth Judicial District, Missoula County, with Attempted Deliberate Homicide and Leaving the Scene of an Accident Resulting in Serious Bodily Injury.  During all district court proceedings, Guillen was represented by Edmund Sheehy of the Office of the State Public Defender.

Guillen and the State eventually arrived at a resolution of the matter.  While the parties did not reach an agreement as to the appropriate sentence for Guillen, the State did agree to amend the Attempted Deliberate Homicide charge to a lesser included offense and the parties were free to argue for whatever sentence they deemed appropriate.  On November 10, 2011, Guillen entered guilty pleas to Leaving the Scene of an Accident and the amended charge of Attempted Mitigated

---

[1] The following factual summary is taken from the Montana Supreme Court's opinions in *State v. Guillen*, 2013 MT 184N, 372 Mont. 547, 317 P. 3d 201 (Table), and *Guillen v. State*, 2018 MT 71, 391 Mont. 131, 415 P. 3d 1, and is presumed correct.  See, *Vasquez v. Kirkland*, 572 F. 3d 1029, 1031, n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

Deliberate Homicide.

On December 29, 2011, the district court held a sentencing hearing. Roberto did not testify at the sentencing hearing nor did he provide a victim-impact statement to the Presentence Investigation (PSI) writer. Roberto's then girlfriend, Sherri Sleepingbear did testify, however, and sought a lengthy sentence, purportedly on behalf of Roberto. Sleepingbear testified in part:

> "[Roberto] wanted me to come here and just tell the court" that "[y]ou destroyed us. You killed your brother. You might as well have killed him, because you pretty much did…[Roberto] just wanted me to look at you straight in the face and tell you exactly what…you did to him."[2]

The district court sentenced Guillen to the maximum sentence of forty (40) years at the Montana State Prison for Attempted Mitigated Deliberate Homicide and a concurrent ten (10) year sentence for Leaving the Scene of an Accident. Guillen did not file a direct appeal.

### i.     Motion to Withdraw Proceedings

On April 12, 2012, Guillen filed a motion to withdraw his guilty plea in the district court, arguing that his plea was involuntary and that the sentence imposed constituted a breach of the parties' agreement. Guillen argued Sheehy misadvised him the agreement he entered into called for a fifteen (15) year sentence and, thus, his plea was coerced.

The district court denied Guillen's motion, finding that his acknowledgment

---

[2] See, *Guillen v. State*, 2018 MT 71, ¶ 20.

on the waiver of rights/plea of guilty form established that there was no agreement in place as to the appropriate sentence and that he could receive up to the maximum sentence allowed by law.  Guillen failed to present additional evidence to support his claim that the plea was involuntary.

Guillen filed a direct appeal to the Montana Supreme Court, advancing the same claims regarding the voluntariness of his plea.  In affirming Guillen's conviction and sentence, the Court determined the district court's findings regarding Guillen's waiver of rights and the lack of sentencing agreement were supported by substantial evidence in the record and that the lower court properly applied well-settled state law. *State v. Guillen*, 2013 MT 184N, ¶ 8, 372 Mont. 547, 317 P. 3d 201 (Table).  The United States Supreme Court denied Guillen's Petition for Certiorari. *Guillen v. Montana*, 134 S. Ct. 2143 (May 5, 2014).

### ii.    Postconviction Proceedings

In January of 2015, Guillen filed a petition for postconviction relief (PCR) in the district court.  Guillen alleged that he possessed newly discovered evidence of his actual innocence and that Sheehy provided ineffective assistance during plea negotiations.  Following a response from the State, the district court held a two-day evidentiary hearing which involved testimony from several witnesses.

Roberto, who remained confined to a wheelchair, testified that despite not having a prior recollection of the collision, now recalled the incident and believed

it was an accident and that his bicycle may have swerved in front of Guillen's van.

Three eyewitnesses to the incident: Shannon Shields, Diane Jontow, and Josh Jontow, also testified regarding their observations. Each witness believed Guillen intentionally struck and ran over Roberto. Sheehy also testified and explained his strategy surrounding plea negotiations and sentencing.

The district court found Sheehy and the eye witnesses' testimony to be credible, but that Roberto's testimony was not. Ultimately, the district court denied Guillen's PCR petition, finding that he did not establish he was actually innocent of the underlying crime or that he had received ineffective assistance of counsel.

### iii.    Postconviction Appeal

Guillen appealed arguing the district court improperly denied his claim of actual innocence and that the ineffective assistance of counsel he received resulted in an involuntary guilty plea.

Guillen claimed in light of Roberto's testimony, that the incident was possibly an accident, there was reason to believe that he did not intentionally commit the offense and the Court erred in determining the claim lacked evidentiary support. See, *Guillen v. State*, 2018 MT 71, ¶ 15. While Guillen argued that Roberto's testimony undermined the *mens rea* element of attempted mitigated homicide, the Court noted proof of *mens rea* is almost always inferred from

5

circumstantial evidence because it is impossible to have direct knowledge or proof of what is in someone's mind. *Id*. The Court determined the district court properly found Roberto's testimony, that he may have swerved in front of Guillen's van and that fault for the accident could be attributable to both of the brothers, was not to be credible. This finding regarding credibility was supported by the other three eyewitnesses' unequivocal testimony that Guillen acted intentionally. *Id*. at ¶ 16. Thus, the district court properly denied Guillen's claim of actual innocence. *Id*.

Guillen maintained that Sheehy performed deficiently by failing to interview Roberto and instead relied upon police reports and a newspaper article, all of which indicated Roberto had no recollection of the incident. *Id*. at ¶ 19. Accordingly, Guillen argued his decision to plead guilty was based upon an incomplete understanding of the facts of the case and was involuntary.

The Court agreed with the district court that Sheehy's decision not to interview Roberto was tactical and did not constitute ineffective assistance of counsel. The Court noted that Sleepingbear's testimony at sentencing indicated Roberto did not wish to be involved in the case or in the sentencing. *Id*. at ¶ 20. Sheehy did not seek out contact with Roberto because he believed doing so could possibly result in a harsher sentence for Guillen, particularly in light of the fact that Roberto was partially paralyzed and would present sympathetically. *Id*. Sheehy's tactical decision did not amount to deficient performance.

6

Moreover, the Court held even if Sheehy had performed deficiently, the failure to interview Roberto did not prejudice Guillen. *Id.* at ¶ 21. Guillen explained that he pled guilty, even believing the incident may have been an accident, in order to limit his overall exposure and potential sentence,

> I was facing 100 years, and the prosecutor told me that that's what he's going to be going for and I- I didn't see any- any evidence that was going to help me fight this case, you know.

*Id.* Thus, Guillen failed to demonstrate, that but for counsel's errors there existed a reasonable probability that he would not have entered a guilty plea. *Id.* Thus, the Court determined the district court properly determined Guillen failed to establish counsel was ineffective.

### III.   Guillen's Claims

Guillen alleges the following violations: (1) the Montana Supreme Court's adjudication of his claim resulted from an unreasonable determination of the facts because it relied upon Roberto's initial statement to law enforcement that he had no recollection of being struck by the van, but Roberto's statements during this time period were unreliable, (Doc. 1 at 9-10); (2) the Montana Supreme Court's adjudication of his claim was based upon an unreasonable determination of the facts because it found Roberto testified he had **possibly** swerved in front of Guillen, making the collision equally his fault, *Id.* at 11-13; (3) the Montana Supreme Court's decision was based upon an unreasonable determination of the

facts because its finding that the eyewitnesses told a coherent story at the PCR hearing is contradicted by the record, *Id.* at 13-33; (4) the Montana Supreme Court's decision that Sheehy did not provide ineffective assistance by failing to interview Roberto prior to plea negotiations and/or sentencing was unreasonable, *Id.* at 33-35; (5) the Montana Supreme Court's determination that Sheehy did not provide ineffective assistance by relying upon a statement provided by Roberto in a newspaper article rather than his own investigation was unreasonable, *Id.* at 35-36; (6) the Montana Supreme Court's decision that Sheehy made a reasonable tactical decision not to interview Roberto, so as not to risk his involvement at the sentencing hearing, and that Sheehy did not provide ineffective assistance was unreasonable, *Id.* at 37-38; (7) the Court's determination that Guillen pled guilty even though he believed incident was accidental was objectively unreasonable, *Id.* at 39-41; (8) the Montana Supreme Court's decision finding Sherry Sleepingbear's testimony more credible than Roberto's, in resolving the IAC claim against Sheehy, was an unreasonable determination, *Id.* at 41-44; (9) and, the Montana Supreme Court unreasonably determined that the district court properly denied Guillen's PCR petition and that his plea was voluntary, *Id.* at 45-47.

Guillen requests this Court grant his petition and order his release from prison. *Id.* at 7, ¶ 16.

## IV.   Legal Standards

To be eligible for federal habeas corpus relief, a state prisoner must establish

that he is "in custody in violation of the Constitution or laws or treaties of the

United States." 28 U.S.C. §2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).

A state prisoner "whose claim was adjudicated on the merits in state court is not

entitled to relief in the federal court unless he meets the requirements of 28 U.S.C.

§2254(d)." *Price v. Vincent*, 538 U.S. 634, 638 (2003). This Court's analysis of

the merits of Guillen's claims is constrained by the applicable standard of review.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)

applies to Guillen's petition because it was filed after 1996. AEDPA substantially

limits the power of federal courts to grant habeas relief to state prisoners, *Hurles v.

Ryan*, 725 F. 3d 768, 777 (9th Cir. 2014), and "demands that state court decisions

be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)

(per curiam). Thus, if a petitioner's claim has been "adjudicated on the merits" in

state court, "AEDPA's highly deferential standards kick in." *Davis v Ayala*, __

U.S. ___, 135 S. Ct. 2187, 2198 (2015) (citations omitted).

Under the deferential standard of AEDPA, a federal court may not grant a

prisoner's petition on a claim that was decided on the merits in state court, unless

the state court's decision: 1) "was contrary to federal law then clearly established

in the holdings of [the United States Supreme Court]"; 2) "involved an

9

unreasonable application of such law"; or 3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (internal quotation marks omitted); see also, 28 U.S.C. §2254(d), *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003).[3] "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

"'[C]learly established Federal law'… is the governing legal principle or principles set forth by the Supreme Court [in its holdings] at the time the state court renders its decision." *Lockyer,* 538 U.S. at 70-71; see also, *Carey v. Musladin*, 549 U.S. 70, 74 (2006),  In addition, the Supreme Court decision must "squarely address [ ] the issue in th[e] case; otherwise, there is no clearly established Federal law for purposes of review under AEDPA." *Moses v. Payne*, 555 F. 3d 742, 754 (9th Cir. 2009), quoting *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).  If no clearly established federal law exists, the inquiry is at an end and the court must defer to the state court's decision. *Carey*, 549 U.S. at 70; *Wright,*

---

[3] 28 U.S.C. §2254(d) is a gateway.  If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo.  See, *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires"); see also, *Cone v. Bell*, 556 U.S. 449, 472 (2009).

552 U.S. at 126.

"For relief to be granted, a state court merits ruling must be so lacking in justification that there was an error…beyond any possibility for fair minded disagreement." *Bemore v. Chappell*, 788 F. 3d 1151, 1160 (9th Cir. 2015). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' …and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010).  The standard is " 'difficult to meet,'" and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

## V.     Analysis

As explained below, because Guillen has not established that the Montana Supreme Court's adjudication of his claims was contrary to or involved an unreasonable application of *Strickland* or resulted from an unreasonable determination of the facts based upon the state court record, this Court must afford deference to the Montana Supreme Court's decision.

### i.     Claims 1-3: Actual Innocence/Witness Testimony

Guillen's first three claims are essentially sub-claims to support his contention that the Montana Supreme Court's decision affirming the denial of his postconviction petition was based upon an unreasonable determination of the facts in light of the record before the court, pursuant to § 2254(d)(2), because he was

11

actually innocent of the underlying crime.  Guillen asserts the Court erred by:
relying upon Roberto's initial statement to law enforcement that he had no
recollection of being struck by the van (Claim 1); determining Roberto later
testified that he had **possibly** swerved in front of Guillen, making both brothers
equally at fault, when Roberto clearly stated he swerved (Claim 2); and, finding
that the eyewitnesses told a coherent story during the PCR proceedings, which is
contradicted by the record (Claim 3).

Under §2254(d)(2), the federal court reviews purely factual questions that
were resolved by the state court. *Lambert v. Blodgett*, 393 F. 3d 943, 978 (9th Cir.
2004).  A state court's factual determination is entitled to deference under section
2254(d)(2) "unless objectively unreasonable in light of the evidence presented in
the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).
"[T]he question on review is whether an appellate panel, applying the normal
standards of appellate review, could reasonably conclude that the finding is
supported by the record." *Id.* Section (d)(2) "applies most readily to situations
where petitioner challenges the state court's findings based entirely on the state
record.  Such a challenge may be based on the claim that the finding is
unsupported by sufficient evidence…that the process employed by the state court
is defective… or that no finding was made by the state court at all." *Taylor v.
Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004), abrogated on other grounds by *Murray*

12

*v. Schiro*, 745 F. 3d 984, 999-1000 (9ᵗʰ Cir. 2014). The standard for finding that a state court made an unreasonable determination of the facts is "daunting" and "will be satisfied in relatively few cases." *Taylor*, 366 F. 3d at 1000. If "reasonable minds reviewing the record might disagree about the finding in question, 'on habeas review that does not suffice to supersede the trial court's …determination.'" *Brumfield v. Cain*, __ U.S. __, 135 S. Ct. 2269, 2277 (2015)(citations omitted). A state court's factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. 2254(e)(1).

In its Findings of Fact, Conclusions of Law, and Order denying Guillen PCR relief, which were affirmed on appeal, the district court found Roberto's testimony not to be credible overall. See, FOF/COL, at 5-6 (March 15, 2016).[4] The district court noted Roberto had difficulty recalling specifics of the events when questioned and that he initially told the police he had no memory of being struck by Guillen's van, but later testified he recalled what happened and that it was an accident. *Id.* at ¶¶ 31-32. Guillen stated it was possible he swerved in front of his brother and he now believed the collision was the fault of both brothers. *Id.* at ¶¶ 33-34.

Before this Court Guillen argues the fact that Roberto initially could not

---

[4] For purposes of clarity, the Clerk of Court will be directed to file a copy of this document into the record in this matter.

remember the incident was unfairly used against him to undermine Roberto's subsequent statement that he swerved in front of Guillen.  Also, Guillen takes issue with the fact that the state courts viewed this swerving as "possible" when he contends Roberto was clear that he swerved in front of Guillen.

There is ample support in the record, however, for the state courts' determination that Roberto's testimony was not credible.  Roberto testified at the PCR hearing that he didn't remember what occurred until at least one month after the incident when he had left the hospital.  (Doc. 1-1 at 37-38).  Roberto also agreed that some aspects of his memory are still hazy.  *Id.* at 41-42.  And even when Roberto described the incident, he was somewhat equivocal.  For example, he surmised that perhaps both he and Guillen were at fault.  *Id.* at 40.  While Roberto claimed he now clearly remembered swerving his bike, when asked if it was his testimony that he now remembered the accident clearly, Roberto equivocated, "Yeah. To some extent. To an extent I am."  *Id.* at 42: 9-11.

Roberto also acknowledged that he wanted to help his brother, wanted to see him get out of prison, that their mother wanted Guillen out of prison, and that those were the reasons why he was testifying.  *Id.* at 40-41.  Although not explicitly stated it can be inferred from Roberto's testimony that he had ample motivation for attempting to provide helpful testimony to his twin brother; Roberto and his family wanted Guillen released from prison.

14

In light of these considerations, Guillen has failed to meet his burden under § 2254(d)(2) of establishing that the state court made an unreasonable factual determination regarding Roberto's testimony.

Additionally, Guillen alleges the state courts' finding that the eyewitnesses told a "coherent story" at the PCR hearing is contradicted by the record.

The district court found each eyewitness to be credible. FOF/COL, ¶¶ 22, 25, 29. The district court noted Shannon Shields testified she viewed the brothers physically fighting in the street. From her vantage point it appeared that the driver of the van intentionally struck Roberto. Shannon drew a diagram for the court, and the court concluded based upon the angle of the van's travel, the only reasonable conclusion was that Guillen intentionally struck Roberto. *Id.* at ¶¶ 19-21.

The Court determined Diane Jontow had a clear view of the incident from the window of her home and testified she was certain Guillen struck Roberto intentionally. *Id.* at ¶¶ 23-24.

The Court also found Josh Jontow had a clear view of the incident from an open window in his home. Josh heard Guillen say something along the lines of, "I am going to fuck you up" prior to driving his van directly at Roberto and striking him. Josh also testified with certainty he believed Guillen intentionally struck Roberto. *Id.* at ¶¶ 26-28.

Guillen primarily seeks to establish inconsistency by comparing the hearing

15

testimony of each witness with the police reports.  See e.g., (Doc. 1 at 14-19; 20-25; 25-30.)  Guillen also claims that each eyewitness provided hearing testimony that was inherently inconsistent with one another.  *Id.* at 31-33.

As a preliminary matter, the Court would note that the police reports were not part of the state court record.  Although reference was made to the reports during the PCR hearing,[5] they were never entered into evidence.  Accordingly, this Court will not consider them because they were not part of the state court record.  See e.g., *Taylor v. Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004) (explaining that a petitioner's challenge to a state court factual determination under § 2254(d)(2) is based upon the state court record).  Any attempt of Guillen to impeach the eyewitness testimony with the police records is immaterial to this Court's consideration.

Additionally, Guillen attempted to advance a similar argument before during the PCR hearing:

> Well, when I read them there was one that said that there was lilac bushes in the way, and then there was another one that said that she looked away as it happened and that my brother looked like he was swerving, and so I don't know.  Those police reports don't really seem that accurate on what happened.

(Doc. 1-1 at 64: 13-18.)

In its findings, the district court did not find Guillen's argument availing.

---

[5] See e.g. Trns. Hrg. (Doc. 1-1 at 55: 16-18; 64: 3-6, 13-18;  110: 6, 10-11).

Moreover, on appeal from PCR, Guillen did not call into question the accuracy or consistency of the eyewitness testimony, rather he disputed the conclusion that Guillen acted intentionally:

> Of these witnesses, none directly contradicted Roberto. In fact, the testimony of the State's witnesses is consistent with Roberto's to the extent they describe the facts they witnessed. Where the State's witnesses deviate from Roberto is when they draw a conclusion regarding [Guillen's] actions. The State's witnesses, from their removed perspective came to the conclusion that [Guillen] had hit Roberto intentionally with his van. Roberto disagreed.

*Guillen v. State*, 2017 WL 4125074, Appellant's Opening Brief, 7-8 (filed Aug. 7, 2017).[6]  Guillen's attempt at this juncture, to point out discrepancies he perceives, is not persuasive.

Guillen has not met the high threshold of showing that the factual findings of the state courts regarding the testimony from Roberto and the eyewitnesses were unreasonable, under § 2254(d)(2).  See, *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Or, put another way, Guillen has not established a court "could not reasonably conclude that the finding is supported by the state court record." *Hibbler v. Benedetti*, 693 F. 3d 1140, 1146, (quoting *Taylor*, 366 F. 3d at 1000). These claims should be denied.

//

---

[6] See also, Guillen's Reply Brief: "In fact, none of the State's witnesses directly contradicted Roberto and were largely consistent with his testimony up to the point where they drew an inference regarding Alberto's intention." *Guillen v. State*, 2017 WL 7036396, Appellant's Reply Brief, 4-5 (filed Dec. 21, 2017).

ii.    **Claims 4-9:** *Strickland* **Claims**

Guillen generally alleges the Montana Supreme Court erred in its holding that Sheehy did not provide ineffective assistance to him under *Strickland v. Washington*, 466 U.S. 668 (1984), and that the purported ineffective assistance he received resulted in an involuntary guilty plea.

The clearly established federal law for ineffective assistance of counsel claims was determined by the Supreme Court in *Strickland*.  Under the two-pronged framework of *Strickland*, the Sixth Amendment guarantee of the right to counsel in a criminal proceeding is violated if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." 466 U.S. at 687. In assessing a claim that counsel's representation did not meet the constitutional minimum, the court is to "indulge in a strong presumption that counsel's conduct f[ell] within the wide range of professional assistance." *Id.*, 466 U.S. at 689. Petitioner bears the burden of showing the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner.  See, *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

Under AEDPA's " 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. A state court decision involves "an

18

unreasonable application of clearly established Federal law" if "there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in a federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Id.* at 103. Or, to put it another way, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. *Id.* at 98-99.

This Court's review of the Montana Supreme Court's determination that trial counsel did not perform deficiently is "doubly" deferential, because *Strickland* requires state courts to give deference to choices made by counsel, and AEDPA, in turn, requires this Court to defer to the determinations of state courts. *Harrington v. Richter*, 562 U.S. 86, 105 (2011)(quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

### a. Deficient Performance (Claims 4-6, 8)

Guillen contends the Montana Supreme Court unreasonably determined that Sheehy did not perform deficiently, contrary to clearly established law, even though he failed to interview Roberto and instead: relied on a law enforcement report that Roberto had no recollection of the incident (Claim 4); relied upon a

newspaper article that stated Roberto had no recollection of the incident (Claim 5); and, proceeded to sentencing without Roberto's involvement for purportedly tactical reasons (Claim 6).   Additionally, Guillen believes the Montana Supreme Court's determination that Sherry Sleepingbear's testimony was more credible than Roberto's in resolving the deficient performance allegation against Sheehy was unreasonable.   (Claim 8).

To satisfy the deficient performance prong, the petitioner must prove counsel's performance was so deficient that it "fell below an objective standard of reasonableness" established by "prevailing professional norms."   *Strickland*, 466 U.S. at 687-88.

Sheehy explained the benefit of negotiating for a lesser charge of attempted mitigated deliberate homicide on Guillen's behalf was that it limited his exposure from a potential 100-year sentence to a maximum 40-year sentence.   (Doc. 1-1 at 118:3-7).   Sheehy also explained the concerns he shared with Guillen regarding proceeding to trial:

> Sheehy:   I think I flat out told him that if we went to trial, we had attempted deliberate homicide or attempted mitigated deliberate homicide, and I think I told him it would be difficult to sell the attempted mitigated for two reasons.
>
> One—and this is the main one—when you do that as a lesser offense, a jury first has to decide that you committed the act of [attempted] deliberate homicide before they can consider whether you did it under—what do we call it—extreme stress or there's a reasonable explanation based on extreme stress.

20

> That's a very—very difficult thing to argue to a jury but I think
> I did tell him that if we went to trial, he was going to be
> convicted.

Marks:     And why did you feel that was the case?

Sheehy:    Mainly because of the people you just brought in to testify
           ahead of me that were eyewitnesses who saw what happened.

*Id.* at 119: 7-24.

Additionally, Sheehy stated that Guillen never provided him a reason to believe the eyewitness accounts were incorrect or professed he was actually innocent of running over Roberto. *Id.* at 119-120. Apparently, a determination was ultimately made that a plea resolution was in Guillen's best interest.

Sheehy explained he did not find it necessary to interview Roberto before the change of plea hearing, because he was unclear with law enforcement and told them either the brother had hit him while he was riding his bike or he ran over him. *Id.* at 116: 5-8. Additionally, prior to the change of plea hearing Sheehy had read a newspaper article in which Roberto told the reporter, in reference to Guillen, "This is the guy that ran over me." *Id.* at 116: 9-13. Sheehy explained he did not believe Roberto would help Guillen's case. *Id.* at 116: 17-19.

Following the change of plea hearing, Sheehy became aware from the PSI writer that Roberto did not want to participate in sentencing. Sheehy explained that it was his belief it may have been counterproductive to have Roberto involved

21

at sentencing because he could have said things that would have been detrimental to Guillen's sentencing arguments.  *Id.* at 128-129.  Sheehy was of the general belief that it is a bad idea to involve a victim at sentencing who doesn't want to be involved when attempting to obtain a favorable sentence.  *Id.*

Sheehy also explained that even if he had interviewed Roberto and even if Roberto had contradicted the statements given at the time and told Sheehy it was an accident, Sheehy still didn't believe such a statement would have changed the outcome for Guillen.  *Id.* at 126.  Sheehy explained the issue then would have been one for trial.  Sheehy stated his hypothetical conversation with Guillen would have gone like this, "Here's what [Roberto] said [it was an accident], but I have to tell you, you've got all these other witnesses that are going to come in and say it wasn't, and I don't think you can win at trial."  *Id.* at 126-127.

Based upon Sheehy's testimony the district court and Montana Supreme Court both determined Sheehy made a reasonable tactical decision not to interview Roberto prior to the change of plea hearing or attempt to involve him in the sentencing proceedings.  Additionally, the Montana Supreme Court noted that Sherry Sleepingbear's sentencing hearing testimony, supported Sheehy's belief that Roberto did not want to discuss the incident or be involved in the trial court proceedings.[7]

---

[7] See, *Guillen*, 2018 MT 71, ¶ 20.

The cases Guillen cites in support of his claim of deficient performance are factually distinct and/or inapposite.  Guillen first relies upon *Howard v. Clark*, 608 F. 3d 653 (9th Cir. 2010), a case where the Ninth Circuit determined the petitioner was entitled to habeas relief on his claim that trial counsel provided ineffective assistance for failing to call the surviving victim of a shooting for which Howard was convicted following a jury trial.  In *Howard* there was a factual dispute as to the identity of the shooter, with eyewitnesses providing conflicting accounts.  In Guillen's case there was no question who was driving that van that ran over Roberto.  Additionally, Howard maintained his innocence and repeatedly insisted that his trial counsel call the surviving victim as a trial witness.  The Circuit determined Howard's attorney was obligated to take his client's request seriously. *Howard*, 608 F. 3d. at 570.  As set forth above, Guillen did not profess his innocence nor did he insist Sheehy interview Roberto or call him as a witness at the sentencing hearing.  Moreover, despite not involving Roberto in the change of plea or sentencing proceedings, Sheehy assessed the case and evidence and determined that Roberto's involvement could actually be detrimental to Guillen.

The second two cases upon which Guillen relies are also factually distinct because they are both involve self-defense claims.  See, *Riley v. Payne*, 352 F. 3d 1313 (9th Cir. 2003), and *Dorsett v. Uribe*, 599 Fed. Appx. 808 (9th Cir. 2015).[8]  In

---

[8] Both of these opinions are attached to Guillen's petition.  See, (Doc. 1-1 at 203-

*Riley*, the Circuit granted the writ of habeas corpus to petitioner Riley who claimed

he was acting in self-defense.  The Circuit determined trial counsel performed

deficiently when he failed to interview or call a critical witness who was present

during the shooting and who supported Riley's claim of self-defense.  See, (Doc.

1-1 at 208-09.)  In *Dorsett*, the Circuit, relying upon *Riley*, also granted a writ to

Dorsett who claimed he was acting in self-defense and alleged his trial counsel

provided ineffective assistance for failing to interview a fellow gang member who

was present for the shooting and corroborated Dorsett's claim of self-defense.

(Doc. 1-1 at 217.)  In these cases, the issue was whether the witness testimony that

was not sought out might have bolstered the respective petitioners' claim of self-

defense.  The failure to seek out this testimony in *Riley* and *Dorsett* constituted

deficient performance.

But Guillen did not claim he was acting in self-defense and, as set forth

above, he never advised Sheehy during the underlying proceedings that what

occurred was an accident. But, even if it were an accident, as explained by Sheehy,

that created a question of fact for the jury and would not have facilitated the

negotiated resolution for the lesser charge of attempted mitigated deliberate

homicide.  Additionally, as set forth above there was no corroboration for

Roberto's claim, more than three years after the fact, that the incident may have

217).

been an accident or partly his fault.[9] To the contrary, even at the time of the postconviction hearing, all three eyewitnesses provided unequivocal testimony that Guillen's act of running over his brother was intentional. Roberto's PCR testimony was deemed unreliable. Guillen has provided nothing that would undermine the state court's finding regarding the lack of credibility of Roberto's testimony.

Likewise, although Guillen takes issue with testimony provided by Sleepingbear, he has not established the state courts' conclusion that her testimony supported Sheehy's belief at the time of sentencing that Roberto did not wish to be involved in the proceedings, and potentially involving Roberto could have jeopardized a more favorable sentence, was unreasonable.

Accordingly, following his investigation Sheehy made a reasonable professional determination that further involvement of Roberto in Guillen's criminal proceedings was unnecessary and potentially detrimental. See, *Strickland*, 466 U.S. at 691. Or put another way, Guillen has failed to establish the state courts unreasonably decided, in his exercise of professional judgment, Sheehy made a reasonable decision to limit the investigation and involvement of Roberto. Because fair-minded jurists could disagree on the correctness of the state court's decision, the decision is not to be considered unreasonable. See, *Richter,* at 98-99.

---

[9] The incident occurred on July 30, 2011; Roberto provided his affidavit in support of Guillen's PCR petition on December 17, 2014. See, (Doc. 1-1 at 147-48.)

Therefore, the state court decision was reasonable and should be afforded deference.

### b. Prejudice (Claims 7, 9)

As both prongs of the *Strickland* test must be satisfied to establish a constitutional violation, a failure to satisfy either requires a petitioner's ineffective assistance of counsel claim be denied. *Strickland*, 466 U.S. at 697. A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of *Strickland* "if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F. 3d 732, 737 (9th Cir.), cert denied, 525 U.S. 839 (1998). Nonetheless, the Court will still examine Guillen's prejudice claims.

Guillen claims the Montana Supreme Court's determinations that he entered a guilty plea even though he believed the incident was an accident, (Claim 7), and, correspondingly, that his guilty plea was voluntary, (Claim 9), were objectively unreasonable.

To demonstrate *Strickland* prejudice:

> [t]he petitioner need not show that the deficient performance more likely than not altered the outcome of the case, but must demonstrate only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Hart v. Gomez*, 174 F. 3d 1067, 1069 (9th Cir. 1999) (quoting *Strickland*, 466 U.S.

at 694).

As set forth above, the Court noted Guillen testified at the PCR hearing that he pled guilty, even though he believed the incident was an accident, because he wanted to take advantage of the State's offer to resolve the case by limiting his prison exposure from 100 to forty years. *Guillen*, 2018 MT 71, ¶ 21. Accordingly, Guillen failed to establish a reasonable probability that, but for Sheehy's purported errors, he would have not entered a guilty plea. *Id*.

Guillen seems to argue that had Sheehy interviewed Roberto following the incident, Roberto would have provided helpful testimony. Based upon this helpful testimony, Guillen would have not pled guilty, but instead would have gone to trial and been acquitted. See e.g., (Doc. 2 at 3,10). Guillen also believes the statement he provided in conjunction with his PSI report supports this theory:

> *In your own words, what did you do to get arrested on this charge?*
> I was taking my baby's mother to the methadone clinic. My brother stop[ed] my van wanted me to help him find his dog. He didn't give me a chance to explain that I was on my way to the gas station where she always runs to, and he [went] right to smashing my windshield. As he was attacking my van I jumped out of my van, then he got to striking me. Then we had a fist fight. Then at some point we stopped. Then Melisa ran down the street crying. So I got back in the van to get her and he was getting on his bike. Didn't see him, drove over him.
>
> *What reason do you have for your involvement in this offense?*
> I was under a lot of stress. My brother damag[ing] my windshield. [Made] it hard to see out the windshield. I told him I was under a lot of stress and not to damage my vehicle.

(Doc. 1-1 at 153.)

27

As set forth above, there was ample reason to believe at the time of the underlying proceedings that Roberto did not want to be involved. The Court understands that years after the fact he was claiming he actually attempted involvement at the trial-court level and believed the incident may have been an accident or that both brothers may have been at fault. But at the time of the trial court proceedings, there was nothing to indicate to any party that Roberto wished to be involved, much less that he would have provided helpful testimony. Roberto did not return calls to the PSI-writer and ostensibly sent Sleepingbear to the sentencing hearing to testify in his stead.

Moreover, the additional facts that Guillen cites, in support of his attempt to demonstrate that he would have not entered a guilty plea, were known to him at the time of his change of plea and sentencing hearing: that his windshield was damaged, that he had difficulty seeing out the windshield, that he purportedly did not see Roberto before running him over. Guillen was also aware that there were three eyewitnesses that strongly believed he intentionally ran Roberto over with the van and would testify accordingly. In weighing his options, Guillen elected to enter a plea to a less serious offense than that originally charged.

Guillen has presented nothing to this Court to establish that but for Sheehy's failure to interview Roberto, a reasonable probability exists that the result of the proceedings would have been different. Guillen was aware of his options,

28

including exercising his right to a jury trial, and elected to plead guilty.  He has not established his guilty plea was involuntary.  Guillen has not shown that the Montana Supreme Court's decision was so lacking in justification that there is no possibility for fair minded disagreement.  See, *Richter*, at 103.  Accordingly, the state court's finding that Guillen was not prejudiced is reasonable and should be afforded deference under 28 U.S.C. § 2254(d).

## VI.    Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules governing § 2254 Proceedings.  A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Guillen's petition should be denied.  His claims do not survive deferential review under 28 U.S.C. § 2254(d).  There are no close questions and there is no reason to encourage further proceedings in this Court.  A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## ORDER

The Clerk of Court is directed to file a copy of the Findings of Fact and Conclusions of Law and Order entered on March 15, 2016, in *Guillen v. Montana*, DV-15-55, into the record in this matter.

## RECOMMENDATION

1. Guillen's Petition (Doc. 1) should be DENIED for lack of merit because it does not survive deferential review.

2. The Clerk of Court should be directed to enter judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Guillen may object to this Findings and Recommendation within 14 days.[10] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

<u>Guillen must immediately notify the Court of any change in his mailing</u>

---

[10] Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)." Therefore, since Guillen is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.

address.  Failure to do so may result in dismissal of his case without notice to him.

DATED this 5ᵗʰ day of November, 2019.

Kathleen L. DeSoto
United States Magistrate Judge